**Jan MOYE, Plaintiff,**

v.

**FLEMING COMPANY, INC., Defendant.**

**Civil Action No. 95–T–269–S.**

United States District Court,
M.D. Alabama,
Southern Division.

April 29, 1996.

---

Dan W. Taliaferro, Paul W. Copeland, Copeland, Franco, Screws & Gill, P.A., Montgomery, AL, for plaintiff.

George Lamar Beck, Jr., Beck & Travis, P.C., Montgomery, AL, for Michael King.

Barry V. Frederick, Charles A. Powell, III, John W. Sheffield, Johnston, Barton, Proctor & Powell, Birmingham, AL, for Fleming Company, Inc.

### *ORDER*

MYRON H. THOMPSON, Chief Judge.

Plaintiff Jan Moye filed this lawsuit against defendant Fleming Company, Inc. seeking relief under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17. Moye contends that, because of her sex, she was harassed by a manager employed by Fleming Company, and she was paid less than men who performed similar jobs. The court has jurisdiction pursuant to 42 U.S.C.A. § 2000e–5(f)(3). This lawsuit is before the court on Fleming Company's motion for summary judgment. The motion will be denied.

## I. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the non-moving party to demonstrate why summary judgment would be inappropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115–17 (11th Cir.1993) (discussing how the responsibilities on the movant and the nonmovant vary depending on whether the

legal issues, as to which the facts in question pertain, are ones on which the movant or nonmovant bears the burden of proof at trial). In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, at this stage, the court assumes that the facts are as Moye alleges them.

## II. BACKGROUND

Moye worked as a warehouse supervisor at Fleming Company's facility in Geneva, Alabama. The company receives grocery products from suppliers and ships them to grocery stores. Many shipments come and go at night. Moye's immediate supervisor was Michael King; they both worked the day shift in the warehouse. As part of her job, Moye reported to King in his office regarding the shipments received and other things that had occurred the night before. King frequently asked Moye about her sex life when she went to his office to make her daily report. King said such things as "did you get any last night" or "smile if you had any lately." On at least one occasion, he invited her to have sex with him, and when she declined, told her that if she ever did have sex with him she would never again want to have sex with another man. On other occasions he said to her that if they had sex they would "go all night long." On seven or eight occasions, he told Moye of his sexual experiences with other women and used "humping" gestures to pantomime the act of sexual intercourse. On another occasion, when only the two of them were standing together near King's office (within the earshot of other people), King told Moye about a time he had sex with another woman on a beach and his penis slipped out "and got sand all over it and it was like screwing a piece of sandpaper." On another occasion, while discussing a shipment of oysters that had come into the warehouse, King said to Moye that he could eat "a couple a dozen of those oysters and I'll screw you all night long." Another time, King observed Moye bending over to stack some cases. He walked up behind her and said that she should not bend over near him because "I just might pop it to you."

In January 1994, Fleming Company informed Moye that her position was being eliminated, and she was offered another job at approximately half the pay she had been receiving. Faced with this demotion and loss of pay, Moye resigned and filed a complaint with the Equal Employment Opportunity Commission (EEOC). She claimed that she had been constructively discharged because of her sex, that she had been sexually harassed by King, and that she had been paid less than male co-workers because of her sex.

Moye's EEOC complaint was the first time that she had directly complained to Fleming Company's management about King's behavior. After receiving Moye's EEOC complaint, the company, without naming the source of the complaint, confronted King with a general allegation that he had behaved crudely. King denied that he had done anything wrong. Fleming Company then interviewed some of Moye's co-workers, many of whom indicated that they had heard King use sexually-explicit language and tell sexually-explicit jokes. The company concluded that, although King may have violated the company's policy prohibiting sexual harassment, none of King's behavior had been specifically directed toward Moye. As a result of Moye's allegation and the subsequent investigation, King's 1994 merit raise was delayed, and he was told that he could be fired if his behavior continued. King was forced to apologize to the workers in his area, and Fleming Company held a meeting with all of its supervisors at which it explained its sexual harassment policy. After King's apology, the company conducted follow-up interviews with employees in King's area, and received no further complaints.

Under Fleming Company's salary structure each job has a predetermined salary range, which includes a minimum, midpoint, and maximum salary. For the entire time she was a warehouse supervisor, Moye was the only woman supervisor. In 1989 and 1990, she was the lowest-paid of the warehouse supervisors, and she earned less than the minimum for her job. In 1991, one warehouse supervisor made less than Moye did,

and she was paid less than the minimum for her job. In 1992, five warehouse supervisors made less than Moye did, and she was paid less than the minimum for her job. In 1993, four warehouse supervisors made less than Moye did, and she was paid the minimum salary for her job.

## III. DISCUSSION

Moye claims that King's sexually-explicit language and crude behavior created a hostile work environment, and that she was paid less than her male co-workers on account of her sex. Fleming Company responds that Moye has failed to make out a prima facie case of sexual harassment; that it cannot be held liable for King's actions because it acted quickly and effectively as soon as Moye complained of his alleged behavior and because it had effective sexual harassment grievance procedures which Moye failed to take advantage of; and that Moye's salary was based on legitimate, job-related criteria.

### A. Sexual Harassment

■■■■ "Hostile environment sexual harassment occurs when an employer's conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment." *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1315 (11th Cir.1989) (citations omitted). To establish a claim of hostile environment sexual harassment, an employee must show initially the following: (1) she belongs to a protected group; (2) she was the subject of unwelcome sexual harassment; (3) the harassment was because of her sex; and (4) the harassment affected a term, condition, or privilege of her employment. *Henson v. City of Dundee*, 682 F.2d 897, 903–905 (11th Cir.1982). In this case the hostile environment was allegedly created by King, Moye's supervisor. Therefore, to recover on her claim against Fleming Company, Moye must show that the company is either directly or indirectly liable for King's actions. To hold Fleming Company directly liable, Moye must show that King acted as the company's agent. *Faragher v. City of Boca Raton*, 76 F.3d 1155, 1163 (11th Cir.1996). To hold Fleming Company indirectly liable, Moye must show that the company knew of or should have known of King's behavior and failed to stop it. *Id.* at 1167.

### 1. The prima facie case

■■■■ For the purposes of summary judgment, Moye has established all of the elements of a prima facie case. First, because Moye is a woman, she belongs to a protected group. Second, Moye has created a genuine issue of fact as to whether the harassment was unwelcome. "The focus of the court should be on whether the complainant 'by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation ... was voluntary.'" *Sims v. Montgomery County Comm'n*, 766 F.Supp. 1052, 1068 (M.D.Ala.1990) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68, 106 S.Ct. 2399, 2406, 91 L.Ed.2d 49 (1986)). Moye did not encourage King's sexual advances or sexually-explicit language, and when he propositioned her, she told him that she was not interested. Further, she tried to get away from him when he used sexually-explicit language. Although Moye never told King in so many words that she wanted him to stop harassing her, she made it clear to him that his language and behavior were unwelcome. Third, King's harassment was because of Moye's sex. Although he used sexually explicit and crude language in the presence of both male and female employees, King did not tell any male employees that he wanted to have sex with them, or that if they had sex with him they would never forget it. It is clear that if Moye had been a man, King would not have harassed her.

■■■■ Fourth, as to whether the harassment affected a term, condition, or privilege of her employment, Moye must show that the harassment was "sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." *Henson*, 682 F.2d at 904. This assessment should include consideration of the totality of the circumstances, *see Faragher*, 76 F.3d at 1162, including, but not limited to, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems,* 510 U.S. 17, ——, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993). This fourth factor has both an objective and subjective component. To be actionable, the conduct must be "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive," *id.* at ——, 114 S.Ct. at 370, and the victim must "subjectively perceive the environment to be abusive." *Id.*[1]

The evidence before the court reflects "an environment that a reasonable person would find hostile or abusive." *Harris,* 510 U.S. at ——, 114 S.Ct. at 370. In addition, Moye has alleged that King's harassment caused her to have vivid nightmares and caused her stress at work and at home. For the purposes of summary judgment, therefore, Moye has created a genuine issue of fact as to whether King's alleged harassment was sufficiently severe and persistent.[2]

### 2. Whether Fleming Company is liable for King's actions

Moye has created genuine issues of material fact about whether King harassed her because of her sex and whether King's harassment created an intimidating, hostile, and offensive work environment. *See Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405. In addition, Moye must show that Fleming Company is liable for King's actions. Fleming Company asserts that it cannot be held liable for King's actions because King was not acting for the company, the company did not know of the harassment, and the company acted quickly when Moye filed her EEOC complaint. The company also asserts that it cannot be liable because it had effective sexual harassment grievance procedures.

### a. Whether Fleming Company is directly liable

 To hold Fleming Company directly liable for King's actions, Moye must show that King "acted as [Fleming Company's] agent in creating a hostile work environment." *Faragher,* 76 F.3d at 1163. "[U]nder agency principles," *id.,* Moye may do this in either of two ways. First, "an employer is directly liable for sexual harassment by a supervisor or other employee acting *within the scope of his employment.*" *Id.* (emphasis added). Second, and alternatively, "[a]n employer also is directly liable ... for sexual harassment by a supervisor or other employee acting *outside the scope of his employment* if the supervisor or employee was *aided* in accomplishing the harassment by the existence of the agency relationship." *Id.* (emphasis added); *see also Sims,* 766 F.Supp. at 1068–70. To make this determination, the court must consider several factors, including "the supervisor's direct authority over the plaintiff[,] ... the overall structure of the workplace, [and] ... the relative positions of the parties involved." *Vance,* 863 F.2d at 1515. The court should not treat these factors as a checklist to be applied "mechanically." *Faragher,* 76 F.3d at 1163. Rather, it must consider the facts of the particular case and analyze the job environment as it existed.

For example, in *Faragher,* the court found that a city could not be held directly liable for the actions of two of its male lifeguard supervisors who sexually harassed two female lifeguards. The court found that, although the harassing supervisors superficially met the *Vance* criteria for liability, under the specific facts of that case and considering the context in which the harassment oc-

---

**1.** *See also Harris,* 510 U.S. at ——, 114 S.Ct. at 371 ("It suffices to prove that a reasonable person subjected to the discriminatory conduct would find ... that the harassment so altered working conditions as to 'ma[k]e it more difficult to the job'") (Ginsburg, J., concurring) (quoting *Davis v. Monsanto Chemical Co.,* 858 F.2d 345, 349 (6th Cir.1988)).

**2.** Where, as here, the alleged victim of sexual harassment did not complain about the harassment to the company at the time, there may be

an issue as to whether she subjectively perceived her work environment to be hostile at the time she was allegedly harassed. "Under *Harris* [510 U.S. 17, ——, 114 S.Ct. 367, 370 (1993)] Title VII is not violated when the victim of harassment does not perceive her work environment to be abusive at the time she is employed." *Faragher,* 76 F.3d at 1161. In this case, as discussed more fully above, for the purposes of summary judgment, Moye has shown that she perceived her work environment to be abusive at the time she was employed.

curred, the city could not be held directly liable for their conduct. First, the context in which the harassment had occurred was not related to job performance. The court stated that, if the supervisors had sexually harassed the victims under the "guise of trying to improve lifeguard performance," *Faragher*, 76 F.3d at 1166, there would have been a basis for finding that they were acting as the city's agents when they harassed the victims. In such a case, the harassment would have occurred within the supervisor-subordinate relationship and would have been related to job performance. In *Vance*, the supervisor who created the racially hostile environment stated that his actions were actually designed to enhance productivity. *Vance*, 863 F.2d at 1506. Based on this, the *Faragher* court concluded that the supervisor in *Vance* had been acting within the scope of his employment when he created the racially hostile environment, creating direct liability. *Faragher*, 76 F.3d at 1166. The focus in each case was on whether the harasser had used his supervisory authority to create the hostile environment and whether the harassment had occurred within the context of job performance.

▆ In addition, in *Faragher* the court found that their supervisory role and power had not aided or enabled the two lifeguards to harass the victims. "[A] supervisor is always, in a sense, aided in accomplishing the tort by the existence of the agency because his responsibilities include close proximity to and regular contact with the victim.... However, the common law rule does not use 'aided' in such a broad sense. Rather, the employer is liable only if the harassment is accomplished by an instrumentality of the agency or through conduct associated with the agency status." *Faragher*, 76 F.3d at 1166 n. 14. Thus, it is not sufficient that the agency relationship passively provided an opportunity for harassment. Rather, a different picture would be presented if the supervisor abused his authority by affirmatively commanding a subordinate to do something in order to harass her. Although not absolutely determinative, a good initial question would be whether a co-employee could have committed the same conduct to same extent under the same or similar circumstances.

▆ Based on the principles announced in *Vance* and refined in *Faragher*, the court concludes that Moye has shown for the purposes of summary judgment that King acted as Fleming Company's agent when he created the sexually hostile environment. King, as Moye's supervisor, used his supervisory power to determine where and when he and Moye interacted, and it was this power, which a co-employee did not have, that enabled him to harass her. It was King's power as a supervisor that allowed him to force Moye to come to his office to give him reports, which, while ostensibly designed to "improve ... performance," *Faragher*, 76 F.3d at 1166, were actually a way for King to get Moye alone so that he could sexually proposition and harass her. While it was King's "close proximity to, and regular contact with" Moye which allowed King to subject her to his sexually-explicit language and jokes in the open, *id.* at 1166 n. 14, it was his supervisory power which allowed him to subject her to sexual harassment where only the two of them were present and thus, most critically, where there was no possibility of corroboration. For example, when Moye entered his office to make her report, King regularly said to her "did you get any last night," and "smile if you had any lately." Further, he told Moye about his sexual acts with other women and used "humping" gestures to pantomime the act of sexual intercourse. There is also evidence that King sexually propositioned Moye when she made her weekly reports to him in his office. During these weekly reports, King would say things such as "smile Jan.... I'll do you like that woman I had last night and I'll put a smile on your face." From this, a jury could reasonably conclude that, as in *Vance*, King's supervisory power allowed him to create not only a sexually-hostile environment, but one that a victim would find difficult to substantiate. *Vance*, 863 F.2d at 1515. Further, a jury could reasonably conclude that, as stated, King's practice of calling Moye into his office to give him reports, while ostensibly designed to "improve ... performance," *Faragher*, 76 F.3d at 1166, was actually a way for King to get Moye alone so that he could sexually proposition and harass her.

Moye also felt that "because [King]'s my supervisor and he has the right to fire, it's difficult to come back at him." This is further evidence from which a jury could conclude that King's supervisory position aided him in his alleged harassment. *See Sims,* 766 F.Supp. at 1071 ("the court is further convinced that [Sheriff] Butler was hopeful that the dispatcher would nonetheless be reluctant to reject him because of his authority over her"). For the purposes of summary judgment, Moye has shown that King acted as Fleming Company's agent when he created the sexually hostile environment.

### b. *Whether Fleming Company is indirectly liable*

To hold Fleming Company indirectly liable for King's actions, Moye must show that the company knew or had reason to know of the alleged harassment and took no effective action to stop the harassment once it learned of it. *Steele,* 867 F.2d at 1316. Fleming Company responds that Moye has not shown that it knew or should have known about King's behavior prior to her complaint and that it took effective and immediate action to stop his behavior as soon as Moye complained. The company further argues that it cannot be held liable because its grievance procedures were reasonably calculated to encourage employees to come forward with complaints. *Sparks,* 830 F.2d at 1560.

Because she admits that she did not complain to Fleming Company about King's behavior before she resigned, to establish indirect liability, Moye must show either that Fleming Company knew or should have known of King's behavior toward her from some other source and failed to correct it.

### i. *Whether Fleming Company knew of or should have known of King's behavior*

■ Moye contends that, because King's behavior was common knowledge at Fleming Company, it is liable even though she did not

follow the company's grievance procedures. It is clear that, if Fleming Company learned of King's behavior from someone other than Moye while Moye still worked at Fleming Company, it did not take effective action to stop the harassment. Therefore, the only issue is whether Fleming Company knew of or reasonably should have known of King's behavior before Moye filed her EEOC complaint. Moye has shown that there is a genuine issue of material fact as to whether Fleming Company knew or should have known of King's behavior. First, from the notes of the investigation following Moye's EEOC complaint, it appears that most of the employees interviewed were aware of King's behavior, and that most of them indicated that King's behavior was common knowledge throughout Fleming Company. Second, Moye complained to an assistant warehouse manager, Bobby Barnes, about King's conduct. Third, another female employee complained to Willard Davidson, a warehouse manager, about King's behavior. Finally, there is evidence that the other managers in the warehouse sometimes closed the doors to their offices because King was so loud and offensive. If these facts are true, then Fleming Company was aware of, or reasonably should have been aware of, the alleged harassment. Thus, there is a genuine issue of material fact as to whether King's conduct was sufficiently pervasive to give rise "to the inference of knowledge or constructive knowledge." *Henson,* 682 F.2d at 905; *see Sims,* 766 F.Supp. at 1071 ("sexual harassment [was] so open and pervasive that all those in supervisory authority should have known about it").[3]

### ii. *Whether Fleming Company's sexual harassment policy and grievance procedures were sufficient*

Although not clearly established, it appears that having an effective sexual harass-

---

**3.** Fleming Company's reaction to Moye's EEOC complaint, however appropriate or effective, does not compel summary judgment. The issue is not whether the company reacted appropriately once Moye complained; the issue is whether the company acted effectively once it learned of King's behavior. Fleming Company has not contended that it took any action against King prior

to Moye's EEOC complaint. Thus, if the company knew of King's behavior before Moye complained and did nothing to correct it or stop the harassment, the company would be liable. *See, e.g., Vance,* 863 F.2d at 1514 n. 8 (remedial action by company does not preclude finding of liability).

ment policy and grievance procedures reasonably calculated to encourage employees to come forward with grievances might protect an employer from respondeat superior liability. *Meritor*, 477 U.S. at 72, 106 S.Ct. at 2408; *Sparks*, 830 F.2d at 1560. In *Meritor*, the Supreme Court suggested that, if an employer had a strong and effective sexual harassment policy that directly addressed sexual harassment and was calculated to encourage victims of harassment to come forward, then it could potentially be insulated from liability. *Meritor*, 477 U.S. at 73, 106 S.Ct. at 2408. There are two issues within this standard: whether the sexual harassment policy and grievance procedures were effective, and whether they are reasonably calculated to encourage complaints.

As to whether Fleming Company's sexual harassment policy and grievance procedures are strong and effective, the EEOC regulations provide some guidance on this issue: "An employer should take all steps necessary to prevent sexual harassment from occurring, such as affirmatively raising the subject, ... informing employees of their right to raise and how to raise the issue ... and developing methods to sensitize all concerned." 29 C.F.R. § 1604.11(f). Fleming Company had written grievance procedures which required a person complaining of sexual harassment to report the harassment to the company's human resources representative. If it received a complaint, Fleming Company promised to conduct a confidential and thorough investigation. In this case, after Moye filed her EEOC complaint, Fleming Company confronted King, who denied the charges. The company then interviewed the other people who worked with and under King, most of whom corroborated at least parts of Moye's charges. After this investigation, the company again confronted King, who admitted some of Moye's charges. Fleming Company forced King to apologize to the workers in his area, delayed his merit raise, and told him that he could be fired if his behavior continued in the future. Finally, some time after King apologized, Fleming Company conducted follow-up interviews with the workers in King's area and heard no complaints about his behavior. Thus, it might appear, at first blush, that the company's sexual harassment policy was reasonably effective.

However, that Fleming Company had adequate grievance procedures on paper and those procedures were effective after Moye had left the company and filed an EEOC complaint do not necessarily lead to the conclusion that the procedures were effective *in practice before Moye had left the company*. Although there is evidence suggesting that the company conducted a seminar on sexual harassment a number of years ago, the record is unclear on how the grievance procedures were explained to employees and what steps, if any, the company took to remind and update employees about these procedures. This concern is important because Moye testified that, although she was aware that the company had an harassment policy and grievance procedures, she was not aware of what they were. Therefore, whether Fleming Company took regular and effective steps to make known to its employees both the substance and availability of its grievance procedures would be a factor to be considered in determining whether the company's procedures were adequate. The court cannot conclude, on the current record, that Fleming Company's grievance procedures were reasonably effective.

As to the second issue, Moye argues that Fleming Company's grievance procedures were not reasonably calculated to encourage complaints. Whether a set of grievance procedures is reasonably calculated to encourage complaints will vary from case to case, and is a question of fact. *Vance*, 863 F.2d at 1513. The *Vance* court considered two factors when it found that the grievance procedures were inadequate. First, the court considered the complainant's fear of retaliation if she complained. *Id.* Here, Moye testified that she feared that if she complained about King, her supervisor, she might suffer retaliation. Therefore, whether Fleming Company had a strong policy to protect complaining subordinates from retaliation by supervisors and whether the company had effectively made this policy known to its employees would be factors to consider in determining whether the compa-

ny's grievance procedures were adequate. The *Vance* court was also concerned that the plaintiff had concluded that the company was not serious about ending racial harassment because the harassment occurred in the open, for all to see, and no one else complained or took action. *Id.* Moye testified that she complained about King to Billy Barnes, an assistant manager, and he laughed and told her not to worry about it. In addition, according to Moye, other warehouse managers sometimes shut their doors so they would not have to hear King's foul language. Moye concluded that, because everyone in the warehouse could hear King, and no action was taken, Fleming Company was not serious about preventing sexual harassment. Finally, Moye was afraid that if she complained, she might lose her job. Based on these facts, a jury could reasonably conclude that Fleming Company's complaint procedure was not reasonably calculated to encourage complaints.[4]

### B. Wage Discrimination

■■■ To establish a prima facie case of sex discrimination, Moye must show that she is female "and that the job she occupied was similar to higher paying jobs occupied by males." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1529 (11th Cir. 1992). If she makes this prima facie showing, the burden then shifts to Fleming Company to produce "a legitimate, non-discriminatory reason for the pay disparity." *Id.* Fleming Company's burden is "exceedingly light," *Perryman v. Johnson Prod., Inc.*, 698 F.2d 1138, 1142 (11th Cir.1983); it "must merely proffer non-gender based reasons,

not prove them." *Meeks v. Computer Associates. Intern.*, 15 F.3d 1013, 1018 (11th Cir. 1994). If Fleming Company does this, the burden shifts back to Moye to show that the "proffered justifications are actually a pretext for gender-based discrimination." *Id.* To establish a prima facie case of wage discrimination, Moye must show two things: that she performed a similar job as her male colleagues, and that she was paid less than they were.

■■■ To show that she performed a similar job as her male co-workers, Moye must show only that "she shared the same type of tasks" as her male co-workers. *Miranda*, 975 F.2d at 1529. She has done this. In her deposition, Moye stated that, although no other supervisor did exactly the same job as she did, her description of the tasks she performed and the tasks performed by the other supervisors shows that she performed at least some of the same tasks and had a similar degree of responsibility as at least some of her male colleagues. To show that she was paid less than male co-workers, Moye has put forth evidence showing her salary and the salaries of the other warehouse supervisors for the period from March 13, 1989, through October 25, 1993. From the first salary report on March 13, 1989, until January 14, 1991, Moye was the lowest paid of the warehouse supervisors (there were eleven in 1989 and ten in 1990 and 1991). The salary report for January 14, 1991, shows that one other supervisor made the same salary as Moye did. From the salary reports, it appears that from 1989 through 1991, three men became warehouse supervisors after Moye was already a super-

---

4. There is evidence in the record suggesting that Fleming Company had a policy that, unless a complaining employee had a corroborating witness to the alleged sexual harassment, there was nothing the company could do because the evidence would consist of only "one person's word against another's." If the company has such a corroboration requirement as a part of its sexual harassment policy and grievance procedures, the requirement is inappropriate. First, that a complaining employee does not have a corroborating witness does not mean that there is no corroborating evidence to be found. A thorough investigation by the company could lead to such evidence. For example, different women, without knowing about each other's circumstances, may

have suffered harassment from the same person. Second, that a harasser was clever enough to harass only in private should not shield him from his company's sexual harassment policy. Indeed, one-on-one harassment could, in some cases, be more egregious and cause greater injury than harassment occurring in a public area. Finally, and most importantly, the bottom line is to stop the harassment, and this may be done through counseling and monitoring of the parties, without necessarily making a determination that the harassment has actually occurred.

Indeed, if Fleming Company's policy is to be truly effective, as required by *Meritor*, it should include notice that corroboration is not required.

visor. The first two started at higher salaries than Moye was being paid at the time; the third started at the same salary that Moye was paid. In 1992, it appears that there were eight supervisors who were hired after Moye was, and six of them made less than Moye did (there were 13 warehouse supervisors). In 1993, it appears that there were six supervisors who were hired after Moye was, and four of them made less than Moye made (there were 11 warehouse supervisors). Moye did not make the minimum salary for her job until 1993. Thus, Moye has put forth sufficient evidence to show that she performed a similar job as her male co-workers and that she was paid less than at least some of them were.

To rebut Moye's prima facie case, Fleming Company must put forth legitimate, non-sex based reasons for the difference between Moye's salary and those of her male co-workers. Fleming Company asserts that Moye did not perform the same job as her male co-workers. As stated above, Moye need not have performed precisely the same job as her male co-workers; she need only have performed a similar job. Although Moye stated that no two supervisors did exactly the same job, her description of her job and her description of the jobs of her male co-workers is sufficiently similar to overcome Fleming Company's assertion that she did not perform a similar job, and create a genuine issue of material fact as to whether Moye and her male co-workers performed similar jobs.

█ Fleming Company's next purportedly legitimate, sex-neutral reason for Moye's low salary is that Moye's initial salary was based on her prior skills and experience, which, according to Fleming Company, were minimal. Thus, Fleming Company asserts, Moye's salary was relatively low because she was less skilled and experienced than the other supervisors. This reason is sufficient to fulfill Fleming Company's burden of put-

ting forth a legitimate, sex-neutral reason for Moye's low salary. To rebut this, Moye has shown that even male workers who became supervisors after she did were paid more than she was paid. Thus, there is a genuine issue of material fact as to whether Moye's salary was based on her skills and experience or whether it was based on her sex.[5]

Accordingly, it is ORDERED that the motion for summary judgment filed by defendant Fleming Company, Inc., on January 2, 1996, is denied.

---

**5.** There is no merit to Fleming Company's assertion that Moye's relatively large raises shows that there was no wage discrimination. "Such information is irrelevant because the [large] raises do not establish that [Fleming Company] was not discriminating against [Moye]. She continued to receive a lower salary than her male counter-

part[s]. [Fleming Company] cannot argue that it should escape liability because it steadily decreased a sex-based disparity. The statute [Title VII] contemplates that discriminatory behavior will immediately be corrected." *EEOC v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1571, n. 5 (11th Cir.1993).