**Natasha DURHAM, et al., Plaintiffs,**

v.

**Mike PHILIPPOU, et al., Defendants.**

**Civil Action No. CV–96–D–69–N.**

United States District Court,
M.D. Alabama,
Northern Division.

March 19, 1997.

Melissa C. Bowen, Prattville, AL, for Plaintiffs.

Charles A. Stewart, III, Dana C. Gibson, Montgomery, AL, for Defendants.

## MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

This matter is now before the court on

Defendants'[1] motion for summary judgment filed on December 10, 1996. The Defendants filed a brief in support of this motion on the same day. Plaintiff filed a response brief in opposition to the Defendants' motion for summary judgment on December 24, 1996. Defendants filed a reply brief on January 14, 1997.

After careful consideration of the arguments of counsel, the relevant case law, and the record as a whole, the court finds that Defendants' motion for summary judgment is due to be granted in part and denied in part.

## JURISDICTION

Based upon 28 U.S.C. §§ 1331, 1343, and 1367, the court properly exercises subject matter jurisdiction over this action. The parties do not contest personal jurisdiction or venue.

## FACTUAL BACKGROUND

This action arises from the Plaintiffs' employment with Little Caesar's Restaurant ("Restaurant") in Prattville, Alabama. The Restaurant is owned by CNG, Inc., an Alabama corporation formed for the purpose of owning and running Little Caesar's restaurants. Defendant Mike Philippou is one of the four CNG shareholders and is an officer of the corporation. Plaintiff Natasha Durham ("Durham") worked at the Restaurant from August 1993 until November 1994, except for a brief period when she voluntarily terminated her employment. Plaintiff Stephanie Culberson ("Culberson") worked at the Restaurant for approximately three months, from September 8, 1994, until November 6, 1994.

*Natasha Durham*

Durham alleges that several months after she began working at the Restaurant, Jesse Smith ("Smith"), a co-employee, began to proposition her during their working hours. Durham alleges that Smith was very persistent and accompanied his requests with lip and tongue gestures. Durham alleges that these comments were so troubling that she complained to a female management employee. According to Durham, soon after this report, Smith's harassment ceased. Soon thereafter, Durham voluntarily terminated her employment.

A short time later, Durham came back to work at the Restaurant. The Restaurant store manager was now Laide Dauda ("Dauda"). Within two weeks of her return, Durham alleges that Smith resumed his harassment by calling her at home using a list of employee home phone numbers. According to Durham, Smith propositioned her every time that they worked together. During this time both Smith and Durham were promoted to shift manager positions.

Durham alleges that on July 10, 1994, Smith grabbed her breast as she walked in the Restaurant. Durham claims that she informed Dauda of the incident the next day; Dauda told her to handle the incident herself. She claims that she then told Dauda that if he did not help her, she would call Harry Abrams ("Abrams"), the CNG area Supervisor with responsibility over the general operations of CNG's restaurants. She claims that Dauda did nothing and she contacted Abrams on July 19, 1994, and asked him "what do you do when somebody touches you in a place that you don't want it, and it's, you know, someone you work with." She claims Abrams told her to "tell me, and they will be fired." Durham then told Abrams of Smith's allegedly harassing activity.

Abrams set up a meeting for July 20, 1994, with Dauda, Smith, Durham, and himself. Following this meeting, Abrams suspended Smith for two weeks and told Durham that she would no longer have to work on the same shift as Smith. According to Durham, Smith's suspension lasted only one week and on several occasions her shift overlapped with one of Smith's shifts for several hours causing them to work together for as much as six hours at a time. However, Durham does not allege that she was ever harassed in the Restaurant following the July 20, 1994, meeting.

Durham claims that following this meeting, Smith began to appear in the Restaurant parking lot when she closed the store on the weekends. She claims that Smith would sit

---

1. Defendants in this action are CNG, Inc. and Mike Philippou.

on the hood of his car and stare at her while she cleaned the store. Durham alleges that Smith's appearances frightened her and forced her to ask her mother to remain at the Restaurant with her until her shift ended. She also alleges that she reported each of these alleged incidents to Dauda and Adams as they occurred but that they took no action. Durham claims that another meeting was held to discuss this problem and the problem of shift overlaps, but that no action was taken to stop Smith's loitering. However, this meeting put a stop to the shift overlap. Durham does claim that on one occasion she was "given the day off" to avoid overlap with Smith's working schedule.

Finally, Durham claims that she told Abrams that he needed either to stop Smith's loitering or that she would call the police. Durham claims that Abrams told her to do whatever she had to do. Durham called the Prattville police on August 19, 1994, and filed a police report which ultimately resulted in Smith's conviction on a charge of harassment by the Prattville Municipal Court. Durham claims that Smith's harassment ceased after she filed the police report. Durham filed a charge of sexual discrimination with the EEOC on August 29, 1994. Subsequently, Durham claims that she was subject to retaliation by being forced to pay money missing from her cash drawer, being allowed to work less hours, and eventually fired.

Predictably, the Defendants' version of events differs substantially from Durham's rendition of events. For instance, Defendants claim that Durham revealed the names of three alleged eye-witnesses during the July 20, 1994, meeting. According to Abrams, the three employees each denied seeing the alleged incident. The Defendants allege that these denials led to the shortening of Smith's suspension to only one week. The Defendants also claim that in a second meeting held sometime in August 1994, the parties agreed that Smith and Durham would no longer work on the same shift.

The Defendants also note that Durham admitted in her deposition that she did not report Smith's alleged harassment until the July 20, 1994, meeting. They allege that Abrams encouraged Durham to call the po-

lice to report Smith's loitering in the parking lot. However, the Defendants do not contend that any intracompany action was taken against Smith with reference to his alleged parking-lot loitering. The Defendants further contend that Durham's termination resulted from three legitimate, written reprimands, two of which were acknowledged by Durham. They claim that the facts of the third reprimand are not disputed by Durham. The Defendants further contend that Durham's hours were reduced based on her own desire to work less rather than as part of a retaliatory plan against her.

*Stephanie Culberson*

While Culberson worked at the Restaurant, Smith served as her shift supervisor. Culberson claims that two weeks after she began work at the Restaurant, Smith began to pressure her to have sex with him. She alleges that on five or six occasions Smith either called her to work early or had her stay late after the other employees had gone home. She alleges that Smith took these actions so that he could pressure her into having sex with her. Culberson also alleges that Smith on one occasion prevented her from leaving the store by taking her time card and register key. She also alleges that another Restaurant employee named Roger harassed her by draping himself over her and rubbing against her.

Culberson concedes that she did not report this allegedly harassing behavior until the day before she left her job at the Restaurant. She provided two weeks notice of her decision to end her employment with the Restaurant. The day before she was scheduled to leave she allegedly informed Dauda that Smith had harassed her. According to Culberson's testimony Dauda offered to speak to Smith about the allegations. However, Culberson told Dauda that such action would be pointless since she was leaving the next day. Culberson claims that despite her efforts to comply with Restaurant procedures her Employee Status Report was marked as not eligible for hire. Culberson filed an EEOC charge alleging sexual discrimination on April 28, 1995. The Defendants' version of these events differs little, except that the Defendants emphasize Culberson's failure to

report Smith's alleged harassment until the day before she left the Restaurant.

Durham and Culberson filed a joint complaint on January 12, 1996. The complaint is divided into six counts, three each for Durham and Culberson. Each Plaintiff alleges (1) that the Defendants violated Title VII by harassing them based upon their sex, (2) that the Defendants' actions constituted the tort of outrage and (3) that the Defendants's actions also constituted the tort of invasion of privacy. None of these six counts deal with a claim of retaliation based upon Title VII. The Plaintiffs do discuss alleged retaliatory actions in the section of their complaint entitled "Statement of Facts."

### SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (cita-

tions omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *see also Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir.1989).

The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions in the file, together with affidavits, if any,'" that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53. Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *see also* Fed.R.Civ.P. 56(e).

In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(c); *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356; *see also Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11.

### DISCUSSION

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's ... sex." 42 U.S.C.A. § 2000e–2(a)(1) (West 1994). Courts recognize two types of sexual harassment claims: quid pro quo and hostile work environment. *Steele v.*

*Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1315 (11th Cir.1989) (citing *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65–66, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986); *Henson v. City of Dundee,* 682 F.2d 897, 908 n. 18, 910 (11th Cir.1982)). Quid pro quo sexual harassment occurs when an "employer alters an employee's job conditions as a result of the employee's refusal to submit to sexual demands", *id.* (citing *Vinson,* 477 U.S. at 65, 106 S.Ct. at 2404–05; *Henson,* 682 F.2d at 908), while hostile work environment harassment occurs when defendant's conduct is "so severe or pervasive that it create[s] a work environment abusive to employees" because of their sex, *Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 22, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993).

*Quid Pro Quo Harassment* [2]

■■■ In order to establish a prima facie case of quid pro quo sexual harassment a plaintiff must show: "(1) that the employee belongs to a protected group, (2) that the employee was subject to unwelcome sexual harassment, (3) that the harassment complained of was based on sex, and (4) that the employee's reaction to the harassment affected tangible aspects of the employee's compensation, or terms, conditions or privileges of employment." *Sparks v. Pilot Freight Carriers,* 830 F.2d 1554, 1564 (11th Cir.1987) (citing *Henson,* 682 F.2d at 909). Basically, a plaintiff in a quid pro quo action must show that the employer changed the "employee's conditions of employment because of [the employee's] refusal to submit to sexual demands." *Virgo v. Riviera Beach Assocs.,* 30 F.3d 1350, 1362 (11th Cir.1994) (citing *Steele,* 867 F.2d at 1315). In order to establish a case of quid pro quo harassment a plaintiff must prove that "plaintiff's acceptance of the harassment is an express or implied condition to receiving a job benefit or not receiving negative treatment." *Clark v. Johnson Controls World Servs., Inc.,* 939 F.Supp. 884, 889(S.D.Ga.1996) (citing *Sowers v. Kemira, Inc.,* 701 F.Supp. 809, 823 (S.D.Ga.1988) (finding a prima facie quid pro quo sexual harassment case where plaintiff's rejection of supervisor's advances resulted in delay of promotion)); *see also Sparks,* 830 F.2d at 1564–65 (finding a prima facie case of quid pro quo sexual harassment where employee was ultimately fired following her refusal to accede to supervisor's sexual demands).

■■ Culberson alleges that Smith's harassment constituted quid pro quo sexual harassment. Culberson specifically alleges that, on several occasions, Smith either called her to come into work early, or requested her to remain at work while others were sent home early. Culberson alleges that Smith said nothing inappropriate when asking her to come in early or stay late but only began to harass her after the other employees left the Restaurant. Culberson does not allege that Smith threatened to reduce her hours if she would not have sex with him or that he would force her to come to work early or stay late if she did not submit to his demands. Further, Culberson does not allege that Smith connected his harassment in any way with the terms or conditions of her employment.

The court finds that Culberson fails to establish a prima facie case of quid pro quo sexual harassment. Culberson relies heavily on the Eleventh Circuit's *Virgo,* 30 F.3d 1350, decision as support for a finding of quid pro quo sexual harassment. In *Virgo,* the harasser was president of a company employing the plaintiff. *Id.* at 1354. The harasser allegedly threatened to "write disparaging reviews concerning [the plaintiff's] job performance" if the plaintiff did not engage in sexual intercourse with him. *Id.* At trial, the plaintiff testified that after she refused the harasser's sexual demands, the harasser spread damaging rumors about the plaintiff alleging that she had taken drugs and slept with company customers. *Id.* at 1362.

Unlike the harasser in *Virgo,* 30 F.3d 1350, Smith did not threaten or damage Culberson's professional situation as part of his harassment. Culberson's response brief does not highlight any such threat or damage and the court's review of Culberson's deposition revealed no evidence of such behavior. Even though Culberson may have been psy-

---

**2.** Durham does not contend that she has a claim for quid pro quo harassment in her response brief. Therefore, the court will only address the quid pro quo claim propounded by Culberson.

chologically damaged by Smith's harassment, there is no ·evidence that her acceptance of the harassment was an express or implied condition to receiving either a job benefit or avoiding negative treatment. *See Clark v. Johnson Controls World Servs.*, 939 F.Supp. 884, 890 (S.D.Ga.1996) (finding no prima facie case of quid pro quo sexual harassment where plaintiff conceded that the harasser "did not use his position to affect adversely any of the terms or conditions of her employment and that his motivation for touching [plaintiff] was solely personal"). Therefore, the court finds that Culberson has failed to produce a material issue of fact on the fourth element of the quid pro quo prima facie case and that summary judgment is due to be granted for the Defendants on Culberson's claim of quid pro quo sexual harassment.

*Hostile Environment Claims*

 To prevail on a hostile work environment claim, plaintiffs must establish that: (1) they belong to a protected class; (2) they were subjected to unwelcome sexual harassment; (3) the harassment was based on their sex; and (4) the harassment affected a term, condition or privilege of employment. *See Henson v. Dundee*, 682 F.2d 897, 903–05 (11th Cir.1982). Additionally, in order to hold the employer liable on a Title VII hostile work environment claim, the plaintiff must show either that: (1) the harasser is the employer or one of its agents or (2) the employer knew or should have known of the harassment caused by co-workers, but failed to take corrective action. *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554 (11th Cir.1987); see *also Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317 (7th Cir.1992). These two theories are referred to as direct and indirect liability, respectively. *See Steele*, 867 F.2d at 1315; *Moye v. Fleming Co., Inc.*, 924 F.Supp. 1119, 1126–29 (M.D.Ala.1996).

*Direct Liability*

 Employers can be held directly liable for the acts of their employees where the

employee was acting as an agent of the employer and fits the definition of an employer. *Steele,.* 867 F.2d at 1316–17; *Vance v. Southern Bell Tel. and Tel. Co.*, 863 F.2d 1503, (11th Cir.1989). The Eleventh Circuit imposes an additional requirement for a finding of direct liability. It requires the employee-plaintiff to show that he or she is subject to both quid pro quo discrimination and hostile environment sexual harassment. *Steele*, 867 F.2d at 1317. Therefore, if a plaintiff cannot show that the alleged harasser committed quid pro quo harassment, then the employer cannot be held directly liable. *Id.* The Plaintiffs strongly disagree with this conclusion and cite other Eleventh Circuit decisions in support of their position. However, these decisions were decided prior to the *Steele* decision and have since been superseded by *Steele*. *See Vance*, 863 F.2d at 1515 (holding the employer directly liable in the absence of a quid pro quo claim); *Sparks*, 830 F.2d at 1559–60 (holding employer directly liable in an action involving claims of quid pro quo and hostile work environment harassment but noting that the panel did not have to decide if direct liability applied in pure hostile work environment situations).

The Plaintiffs also cite *Moye v. Fleming Co. Inc.*, 924 F.Supp. 1119 (M.D.Ala.1996), as support for their position. However, an examination of the *Moye* decision shows that the court relied extensively on the Eleventh Circuit's decision in *Faragher v. City of Boca Raton*, 76 F.3d 1155, *vacated*, 83 F.3d 1346 (1996), to support its finding of direct liability in the absence of a quid pro quo claim. *Moye*, 924 F.Supp. at 1126–28. However, the *Faragher* decision was subsequently vacated casting doubt on the validity of the *Moye's* direct liability finding.[3] *Faragher*, 83 F.3d 1346 (11th Cir.1996) ("It is ORDERED that the above cause shall be reheard by this court en banc. The previous panel's opinion is hereby VACATED."). Further, the Eleventh Circuit's decision in *Splunge v. Shoney's, Inc.*, 97 F.3d 488, 490 (11th Cir.1996), holds that an employer may not be directly liable in actions involving only hostile work

---

**3.** The *Faragher* panel acknowledged the conflict between *Steele, Sparks,* and *Vance.* While the *Faragher* panel ultimately decided that direct liability may be appropriate in limited pure hostile

environment sexual harassment situations, its opinion was ultimately vacated, leaving *Steele* as the controlling Eleventh Circuit decision on this point.

environment claims. Therefore, the court finds that the Plaintiffs, as a matter of law, cannot prove that CNG is directly liable for Smith's actions since neither of the Plaintiffs has a viable quid pro quo claim.

Additionally, even under the framework espoused by the *Moye* court, the Plaintiffs' effort to prove direct liability fails. An agency determination depends on " 'the supervisor's direct authority over the plaintiff[,] . . . the overall structure of the workplace, [and] . . . the relative positions of the parties involved.' " *Moye,* 924 F.Supp. at 1126 (quoting *Vance,* 863 F.2d at 1515). According to the *Moye* court, these factors should not be applied in a " 'mechanical' " fashion, *id.* (quoting *Faragher,* 76 F.3d at 1163), but instead should focus on "the facts of the particular case and analyze the job environment as it existed," *id.* Relying upon the *Faragher* and *Vance* decisions, the *Moye* court considered whether the harassment was related to job performance and whether the harasser used his supervisory authority to create the hostile environment. *Id.* at 1127. Specifically, *Moye* directs courts to examine whether "the harassment occurred within the context of job performance." *Id.* It is not enough that the agency relationship provides "an opportunity for harassment"; instead, the employer is only liable when the harassment is realized by virtue of the agency relationship. *Id.*

Under *Moye,* the fact that Smith and Durham occupied the same level positions while working at the Restaurant invalidates any effort by Durham to establish direct liability against CNG based upon Smith's actions. However, Culberson was Smith's subordinate. While Smith used his position to provide a vehicle for her harassment, the court finds that his position was not an integral part of Culberson's harassment. There is no evidence that Smith used his harassment as a method for improving Culberson's job performance nor is there any evidence that Smith's position prevented Culberson from reporting the alleged harassment. *See Moye,* 924 F.Supp. at 1127–28. Therefore,

the court finds that summary judgment is due to be granted on Plaintiffs' claims of direct liability based upon their hostile work environment claims.

Indirect Liability

■ Employers are indirectly liable for the actions of their employees when the " 'employer knew or should have known of the harassment in question and failed to take prompt remedial action.' " *Kilgore v. Thompson & Brock Management,* 93 F.3d 752, 753 (11th Cir.1996). An employee can demonstrate that an employer had knowledge of harassment by showing either that the employee " 'complained to higher management of the problem or by demonstrating that the harassment was so pervasive that an inference of constructive knowledge arises.' " *Id.* at 754 (quoting *Huddleston v. Roger Dean Chevrolet, Inc.,* 845 F.2d 900, 904 (11th Cir.1988)).

■ The Defendants do not contest the presence of actionable sexual harassment by Smith against Culberson and Durham. The only dispute between the parties is over the Defendants' knowledge and their action based upon such knowledge. Therefore, the court assumes that both Culberson and Durham have demonstrated a prima facie case of hostile environment sexual harassment and will focus exclusively on the Defendants' knowledge and reaction to this information. Culberson reported Smith's harassing activities in a meeting with Dauda the day before she left her job at the Restaurant.[4] Therefore, the court finds that Defendants had actual notice of Smith's harassment on the day before Culberson's departure.

■ On the issue of constructive notice, the court finds that Smith's alleged harassment of Culberson was not so pervasive as to demonstrate that the Defendants had constructive knowledge of this alleged harassment prior to Culberson's conversation with Dauda. *See Splunge,* 97 F.3d at 490 (holding that employer had constructive knowledge where a restaurant's entire managerial staff were found to have sexually harassed the

---

4. Although the Defendants argue that Dauda was not a member of higher management, the court does not have to reach that issue to resolve

Culberson's claim. However, the court notes that the *Kilgore* decision appears to strongly support Defendants' contention. 93 F.3d at 754.

plaintiffs). According to Culberson, Smith would wait until the other employees had left and then "he would discreetly [harass me] where no one could hear him but me." Culberson Depo. at 59. Culberson also alleged that Smith called her at home to harass her. Neither of these allegedly harassing activities placed the Defendants on constructive notice of Smith's harassment.

■ Dauda was informed of Smith's alleged harassment one day before Culberson left her position at the Restaurant. Even though Culberson was scheduled to leave the next day, Dauda offered to discuss the matter with Smith. However, Culberson told Dauda to drop the matter because she was leaving the next day. The evidence does not show that the Defendants took any further action against Smith following Culberson's conversation with Smith. Once an employer learns of sexual harassment, it must take "prompt remedial action" which is " 'reasonably likely to prevent the misconduct from recurring.' " *Kilgore,* 93 F.3d at 754. The court finds that the employer's inaction was appropriate in this case because Culberson was leaving her position the next workday and would no longer be subject to Smith's alleged harassment. However, the court notes that its approval of Defendants' inactivity is entirely dependent on the unique facts of this action involving a report extremely close to an employee's already set departure date.[5]

■ Durham also reported Smith's alleged harassing activities. She told Abrams that Smith had allegedly grabbed her breast and later told him about Smith's alleged loitering outside the Restaurant. Durham claims that she informed Abrams of these incidents either at the time they were occurring or within a day or two of their occurrence. Constructive notice is not at issue since the Defendants had actual notice contemporaneously with the alleged harassment. Therefore, the only issue is the Defendants' response to Durham's reports of harassment.

The court finds that the Defendants properly responded to Durham's allegations of Smith's harassment within the Restaurant but failed to properly respond to Smith's alleged loitering in the parking lot. Durham reported that Smith had touched her on July 19, 1994, and a meeting was held the next day to discuss the incident. Abrams, Dauda, Durham, and Smith were present at this meeting. As a result of this meeting, Abrams suspended Smith for two weeks and then initiated an investigation into Durham's allegations. According to the Defendants, this investigation failed to support Durham's allegations and Smith's suspension was shortened to one week. The Defendants also directed that Smith and Durham were not to work on the same shift. While it appears that Smith and Durham's shifts often overlapped, Durham testified in her deposition that there were always others in the Restaurant while both were working.

At some point in August 1994, a second meeting was held to further discuss the scheduling of Smith and Durham. During this meeting, Durham and Smith were directed not to enter the store while the other was working. According to Durham, Smith initially disregarded this policy but following complaints to Abrams, he eventually ceased his visits to the store while she was working. Durham does not allege that Smith sexually harassed her while both were in the Restaurant after the first meeting on July 20, 1994. However, Smith began to appear outside the store on nights that Durham was working and Smith was off-duty. On these nights, Durham claims that Smith said nothing but glared at her through the windows while she worked inside. Durham alleges that she told Abrams on several different occasions about Smith's loitering.

There is no evidence that the Defendants reacted to these reports. Durham claims that as a result of Defendants' inaction, she eventually called Abrams and told him that she was going to call the police if he did not put a stop to Smith's loitering. Durham claims that Abrams told her to do what she

5. Culberson's report and Durham's subsequent allegations may place the Defendants on constructive notice that Smith could harass other Restaurant employees in the future. The court finds, however, that these two incidents were not sufficient to place the Defendants on constructive notice of the Plaintiffs' claimed sexual harassment.

had to, while Abrams claims that he encouraged Durham to call the police. Either way, Durham took the corrective action and not the Defendants. This corrective action only came after Durham had allegedly reported Smith's behavior on several occasions. Therefore, even though the Defendants were on actual notice, they failed to take any action designed to stop Smith's loitering. Instead, their inaction allegedly forced the harassment victim to take matters into her own hands.

Only after Durham acted did the alleged harassment end. The Defendants contend that the court should focus not on their actions but instead on the undisputed fact that Smith's harassment ended with Durham's police report. For the court to do so rewards the Defendants for the Plaintiff's efforts. The court will not credit the Defendants for the Plaintiff's decision that enough was enough. Therefore, it cannot find as a matter of law that the Defendants took prompt, remedial action to stop Smith's loitering. For this reason, the court finds that there is a material issue of fact over this element of Durham's hostile environment claim. Therefore, summary judgment is due to be denied on that portion of Durham's hostile work environment sexual harassment claim dealing with Smith's alleged loitering outside the Restaurant.

*Retaliation Claims*

While the parties discuss retaliation claims in their briefs, the court can find no such count in the Plaintiffs' complaint. The six clearly labeled counts clearly deal with other claims. While notice pleading has ended the days of strict formalism, a plaintiff must provide some guidance to the defendant as to the claims at issue in a lawsuit. The court notes that although the portion of the Plaintiffs' complaint entitled "Statement of Facts" does allege that "certain acts of retaliation were made against Plaintiff Durham" following the filing of her EEOC charge, the complaint does not allege that the Defendants retaliated against Durham in violation of Title VII. The complaint makes no mention of retaliation in reference to Culberson.

This shortcoming aside, the court finds that Plaintiffs lack viable retaliation claims. Culberson's EEOC charge contains no mention of a retaliation claim which invalidates an effort to argue such a claim at trial. *See Zellars v. Liberty Nat'l Life Ins. Co.,* 907 F.Supp. 355, 358 (M.D.Ala.1995). The court also finds that Durham has failed to establish a prima facie case of retaliation.

To establish a prima facie case of retaliation, Durham must show (1) she engaged in protected activity; (2) the Defendants took some sort of adverse employment action against her; and (3) a causal link exists between the protected activity and the adverse employment action. *Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1494 (11th Cir.1989), *Alford v. City of Montgomery, Alabama,* 879 F.Supp. 1143, 1152 (M.D.Ala.1995) (citations omitted), *aff'd,* 79 F.3d 1160 (11th Cir.1996). Durham alleges that she was fired because she filed an EEOC charge alleging that the Defendants sexually harassed her. The only element the court questions is the third, which requires Durham to show a causal link between her firing and her EEOC charge.

Defendants allege that Durham was fired on the basis of three written reprimands issued by Dauda including a reprimand issued on October 3, 1994, claiming that Durham incorrectly told a customer that a product was not available, spread butter on "Crazy Bread" with a paper towel instead of a brush, and failed to properly clean the Restaurant before closing for the night.[6] In her deposition, Durham claims that she did not use a paper towel to spread butter on "Crazy Bread" and also claims that Dauda refused to provide the customer's name and phone number so that she could resolve the complaint. However, Durham does not show that Restaurant employees are regularly given the opportunity to call customers to resolve complaints and she does nothing to address the improper closing portion of the October 3rd reprimand. Durham also does not contest the other two reprimands which she signed. The court finds that Dur-

---

**6.** "Crazy Bread," a trade name used by Little Caesar's, is a garlic bread product. Restaurant procedures require employees to use a brush to spread butter on "Crazy Bread."

ham's offering is insufficient evidence of a link between her firing and her harassment complaints. Specifically, the court finds insufficient evidence of pretext. For this reason, the court finds that Durham has failed to establish a prima facie case of retaliation and summary judgment is due on this claim.[7]

*State Law Claims: Tort of Outrage and Invasion of Privacy*

The Supreme Court of Alabama recognized the tort of outrage in *American Road Service Co. v. Inmon*, 394 So.2d 361 (Ala.1980). Under the tort of outrage, liability is imposed for "unprivileged, intentional or reckless conduct of an extreme and outrageous nature, and only that which causes severe emotional distress." *Id.* at 365. The court emphasized the severity of the conduct required to support an outrage claim: "conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Id.*

To establish the tort of outrage, the plaintiff must prove three elements: "(1) the actor intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from his conduct; (2) the conduct was extreme and outrageous; and (3) the distress was severe." *Moore v. Spiller Associated Furniture, Inc.*, 598 So.2d 835 (Ala.1992) (quoting *Perkins v. Dean*, 570 So.2d 1217, 1219 (Ala.1990)).

The Supreme Court of Alabama summarized the exceedingly narrow scope of the tort as follows:

[T]he tort of outrage is a very limited cause of action that is available only in the most egregious circumstances. As a consequence, this court has held in a large majority of the outrage cases reviewed that no jury question was presented ... In fact, in the 12 years since *Inmon* was decided, all cases in which this court has found a jury question on an outrage claim have fallen within only three categories: 1) cases having to do with wrongful conduct in the context of family burials ... 2) a case where insurance agents employed heavy handed, barbaric means in attempting to coerce the insured into settling an insurance claim ... 3) **a case** involving egregious sexual harassment. (emphasis added).

*Thomas v. BSE Indus. Contractors, Inc.*, 624 So.2d 1041, 1044 (Ala.1993).

In *Busby v. Truswal Systems Corp.*, 551 So.2d 322, 324 (Ala.1989), the Alabama Supreme Court held that a plant supervisor's extreme sexual harassment of his female employees created a jury question as to liability for the tort of outrage. In *Busby*, the court found that there was evidence of at least seventeen incidents of harassment.[8] The court found there was evidence that the harasser,

(1) invited Busby and Money to swim in his pool in the nude with him; (2) told Busby his hands were cold and asked if he could put them in her pockets to keep them warm; (3) told the plaintiffs that he would 'put a stick on their machines' so they could masturbate while working; (4) said that he could perform intercourse as fast as one of the machines at the plant could operate; (5) said that he wished that the plaintiffs would come to work braless and wear less clothing; (6) told one of the plaintiffs that if she had not stayed up all night having sex she could do her work properly; (7) told one employee that if she would give him 30 minutes with her that he would fill her pants in nine months for her; (8) acted as if he was going to pinch one plaintiff's breasts with a pair of pliers and with his hands; (9) said that he should send one of the plaintiffs across the street to where a group of men were standing

---

7. Durham also claims that Defendants retaliated against her by reducing her working hours and forcing her to pay the Restaurant $13.00 resulting from a cash drawer shortage. The court finds that Durham has failed to show a causal connection between these actions and her EEOC filing.

8. The *Busby* Court noted the incidents of harassment in the context of deciding the plaintiff's invasion of privacy claim. The Court presumes this same evidence was utilized by the *Busby* Court to assess the plaintiff's outrage claim. *See* 551 So.2d at 324.

because she stayed sexually aroused all of the time; (10) told one of the plaintiffs that he was very tired and asked her if she would accompany him to the restroom and hold his penis while he urinated; (11) told one of the plaintiffs that her nipples were as large as another employee's entire breasts; (12) attempted to follow one of the plaintiffs into the restroom and when she asked him where he was going, said that he was going to help her; (13) followed one of the plaintiffs one night; (14) said that a table in his office had been damaged when one of the plaintiffs and a male co-employee had sex on top of it; (15) openly stared at the plaintiffs' sexual anatomy; (16) put his arm around the plaintiffs, grabbed their arms, and stroked their necks; and (17) made other lewd remarks and gestures to the plaintiffs.

*Busby,* 551 So.2d at 324. The court found that these actions, considered altogether, could constitute extreme and outrageous conduct. *Id.*

As this discussion demonstrates outrage is not easily proven in Alabama. In comparison to this high standard, the Plaintiffs' allegations fall well short. For this reason, summary judgment is due to be granted on the Plaintiffs' claims of outrage.

 Alabama law recognizes the tort of invasion of privacy. The Supreme Court of Alabama, in an opinion written upon certification from the Circuit Court of Appeals for the Eleventh Circuit, held that this tort includes four separate "wrongs":

1) [T]he intrusion upon the plaintiff's physical solitude or seclusion; 2) publicity which violates the ordinary decencies; 3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; and 4) the appropriation of some element of the plaintiff's personality for a commercial use.

*Phillips v. Smalley Maintenance Services, Inc.,* 435 So.2d 705, 708 (Ala.1983) (citations omitted). The Alabama Supreme Court later refined this definition:

[There are] two separate standards for finding the tort of an invasion of privacy: 1) If there has not been public or commer-

cial use or publication, then the proper standard is whether there has been an "intrusion upon the plaintiff's physical solitude or seclusion," or a "wrongful intrusion into one's private activities in such manner so as to outrage or to cause mental suffering, shame or humiliation to a person of ordinary sensibilities," and 2) if there has been public or commercial use or publication of private information, then the proper standard is whether there has been "unwarranted publicity," "unwarranted appropriation or exploitation of one's personality," publication of private affairs not within the legitimate concern of the public, an intrusion into one's "physical solitude or seclusion," the placing of one in a "false but not necessarily defamatory position in the public eye," or an "appropriation of some element of [one's] personality for commercial use."

*Hogin v. Cottingham,* 533 So.2d 525, 530–31 (Ala.1988) (citations omitted). Thus, the tort of invasion of privacy may arise when there is either a "public and commercial use or publication" or a "wrongful intrusion into one's private activities or solitude or seclusion." *Johnson v. Corporate Special Servs., Inc.,* 602 So.2d 385, 387 (Ala.1992).

 Here, the Plaintiffs can only claim that the Defendants wrongfully intruded in their privacy, physical solitude, or seclusion. The *Hogin* Court elaborated on a wrongful intrusion claim:

"[T]here must be something in the nature of prying or intrusion" and "the intrusion must be something which would be offensive or objectionable to a reasonable person. The thing into which there is intrusion or prying must be, and be entitled to be, private." Two primary factors are considered in "determining whether or not an intrusion which effects access to private information is actionable. The first is the means used. The second is the defendant's purpose for obtaining the information."

533 So.2d at 531 (citations omitted). The court notes that the inquiry in an invasion of privacy claim is similar to that made in an outrage claim. When evaluating an outrage claim a court asks whether the defendant's

conduct was "extreme and outrageous," while when considering an invasion of privacy claim, the court determines whether the defendant has made a "wrongful intrusion into one's private activities in such manner so as to outrage or to cause mental suffering, shame or humiliation to a person of ordinary sensibilities." *Hogin,* 533 So.2d at 530–31. While conduct needed to support an invasion of privacy claim need not be "extreme and outrageous," in cases where a viable claim for invasion of privacy exists, the defendant's behavior frequently approaches such a degree. *Compare Busby supra* (factors supporting invasion of privacy claim supported outrage claim) with *Carter v. Innisfree Hotel, Inc.,* 661 So.2d 1174 (Ala.1995) (facts supported invasion of privacy claim premised on wrongful intrusion but not outrage claim).

A survey of decisions by the Alabama Supreme Court and the Federal District Courts of the Middle District of Alabama supply this court with a roadmap for determining whether comments and questions of a sexual nature are sufficiently outrageous to support a claim for invasion of privacy. *Busby, supra,* represents one end of the spectrum—extreme and outrageous sexual harassment will support an invasion of privacy claim. In *Phillips v. Smalley Maintenance Services,* 435 So.2d 705 (Ala.1983), the court did not address the viability of an outrage claim, but found that an action for invasion of privacy would lie where: (1) the employer questioned a female employee two or three times a week for period of three months behind "locked doors" about the employee's sexual experiences; (2) the employer later made coercive sexual advances towards employee; and (3) whereupon the employee suffered severe mental trauma. However, in *McIsaac v. WZEW–FM Corp.,* 495 So.2d 649, 650 (Ala. 1986), although an employer repeatedly asked a female employee to "be available," tried to kiss her several times and later attempted to have her fired for resisting his advances, the court found that the plaintiff/employee had failed to establish a viable invasion of privacy claim. Finally, in *Logan*

*v. Sears, Roebuck & Co.,* 466 So.2d 121, 123–24 (Ala.1985), the court held that the defendant's statement that the plaintiff was as "queer as a three.dollar bill" was not outrageous enough to maintain an invasion of privacy claim.

The court finds that Plaintiffs' claims do not rise to the level required to prove an invasion of privacy claim.[9] Smith's alleged behavior does not reach the requisite level shown in the *Phillips* or *Busby* decisions. Instead, his behavior is much closer to the behavior found in *McIsaac.* The Plaintiffs do not allege that Smith continually inquired into their sexual interests or activities. Instead, they allege a pattern of persistent propositions. While this behavior is reprehensible, it is not the demanding, intrusive questioning exhibited in *Phillips.* Smith also lacked the power of the harassers in the *Phillips, Busby,* and even *McIsaac* decisions. For all these reasons, the court finds that summary judgment is due to be granted on the Plaintiffs' invasion of privacy claims. *But see Patterson v. Augat Wiring Systems, Inc.,* 944 F.Supp. 1509, 1522–23 (M.D.Ala. 1996) (finding that an invasion of privacy claim should survive a motion for judgment on the pleadings and stating that "allegations of sexual harassment are sufficient to state a claim of invasion of privacy"); *Sphere Drake Ins., P.L.C. v. Shoney's, Inc.,* 923 F.Supp. 1481, 1490 (M.D.Ala.1996) (finding that claims of verbal sexual harassment may constitute a viable invasion of privacy claim).

*Mike Philippou's Capacity as an Individual Defendant*

As this Court has previously held, individual liability may not be imposed under a Title VII cause of action. *Smith v. Capitol City Club of Montgomery,* 850 F.Supp. 976 (M.D.Ala.1994). The Plaintiffs do not dispute this point in their response brief. Accordingly, with respect to the Plaintiffs' Title VII claim, summary judgment in favor of Philippou is due to be granted.

---

9. While the court acknowledges that employers are not automatically liable for the intentional torts of their employees, the court does not have to reach this issue to resolve the Plaintiffs state law intentional tort claims. *See Mardis v. Robbins Tire & Rubber Co.,* 669 So.2d 885, 889 (Ala.1995).

## CONCLUSION

Based on the foregoing analysis, it is CON-SIDERED and ORDERED that Defendants' motion for summary judgment be and the same is hereby GRANTED in part and DE-NIED in part.