Susan G. GRAHAM, Plaintiff,

v.

**STATE OF FLORIDA, DEPARTMENT OF CORRECTIONS, Defendant.**

**No. 96–900–CIV–J–20B.**

United States District Court,
M.D. Florida,
Jacksonville Division.

March 23, 1998.

Maxie Broome, Jr., Law Office of Maxie Broome Jr., Jacksonville, FL, for plaintiff.

John F. Dickinson, F. Damon Kitchen, Malfitano, Campbell & Dickinson, Jacksonville, FL, for defendant.

### ORDER

SCHLESINGER, District Judge.

Before the Court is Defendant's Motion for Summary Judgment (Doc. No. 77, filed January 16, 1998). Plaintiff filed a Response on February 24, 1998. See Doc. No. 83. On March 9, 1998, Defendant filed its Motion to Strike Plaintiff's Response. See Doc. No. 84. In response to that Motion to Strike, Plaintiff filed her Emergency Motion for Enlargement of Time on March 16, 1998. See Doc. No. 86. Plaintiff's Emergency Motion (Doc. No. 86) is **GRANTED.** Accordingly, Plaintiff's response will be deemed timely filed, and Defendant's Motion to Strike (Doc. No. 84) is **DENIED.**[1]

### DISCUSSION

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of showing the Court, by reference to materials on file that there are no genuine issues of material fact that should be decided at trial. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir.1991). When a moving party has discharged its burden, the nonmoving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing that there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the nonmovant, Key West Harbour v. City of Key West, 987 F.2d 723, 726 (11th Cir.1993), and resolve all reasonable doubts in that party's favor, Spence v. Zimmerman, 873 F.2d 256, 257 (11th Cir.1989).

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary

1. Those portions of Defendant's Motion to Strike not dealing with the alleged untimeliness of Plaintiff's Response will not be used as a basis to strike that Response but will be considered in assessing whether Plaintiff has sustained her burden in opposing Defendant's Motion for Summary Judgment.

judgment motion. *Augusta Iron and Steel Works v. Employers Insurance of Wausau,* 835 F.2d 855, 856 (11th Cir.1988). It must be emphasized that the mere existence of *some* alleged factual dispute will not defeat an otherwise properly supported summary judgment motion. Rather, "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

■ Defendant argues that it is entitled to summary judgment on the quid pro quo sexual harassment claim because there is no evidence that the alleged harassers, Esford and Sapp, promised Plaintiff anything for sexual favors or threatened Plaintiff for not succumbing to their sexual advances. Defendant argues that summary judgment is appropriate on Plaintiff's hostile work environment claim because it took prompt remedial action after a formal complaint was made and that it did not know—and there was no reason to know—of any misconduct prior to that time.

■ The Court agrees with the Defendant that nothing in the record supports Plaintiff's claim for quid pro quo sexual harassment. Quid pro quo sexual harassment occurs when

> [t]he employee's reaction to harassment complained of affect[s] tangible aspects of the employee's compensation, terms, conditions, or privileges of employment. The acceptance or rejection of the harassment by an employee must be an express or implied condition to the receipt of a job benefit or the cause of a tangible job detriment in order to create liability under this theory of sexual harassment.

*Farley v. American Cast Iron Pipe Co.,* 115 F.3d 1548, 1552 (11th Cir.1997) (*quoting Henson v. City of Dundee,* 682 F.2d 897, 909 (11th Cir.1982)).

■ Plaintiff argues in its motion that "Ms. Graham's reaction to the subject DOC agents' unwelcome sexual advances affected tangible aspects of her compensation, terms, conditions or privileges of employment" because "When Ms. Graham complained about the subject DOC agents' sexual harassment of her to DOC Central Office, she was already on a disparate work schedule. To the extent DOC failed to investigate her charge, she was constructively kept away from the job, which has resulted in her loosing [sic.] invaluable job salary and benefits; all because she rejected the sexual harassment of the subject DOC agents." Response at p. 14. Plaintiff cannot establish a prima facie case of quid pro quo sexual harassment when "the nature of the harassing conduct involved neither promises nor threats related to any aspects of [Plaintiff's] job" and when there is no evidence that the alleged harassers "subjected [Plaintiff] to adverse consequences or conditioned any job benefit or detriment on her acceptance of ... sexual advances." *Farley,* 115 F.3d at 1553; *see Durham v. Philippou,* 968 F.Supp. 648, 654–55 (M.D.Ala. 1997) ("Even though Culberson may have been psychologically damaged by Smith's harassment, there is no evidence that her acceptance of the harassment was an express or implied condition to receiving either a job benefit or avoiding negative treatment."). It is clear to the Court that no quid pro quo sexual harassment can be established on these facts.

■ The Court has an even greater concern with respect to Plaintiff's hostile work environment sexual harassment claim: the conduct of which Plaintiff complains does not rise to the level of pervasiveness or severity required such that Plaintiff could properly maintain this claim. Title VII only prohibits sexual harassment that is "sufficiently severe or pervasive to alter the conditions of the Plaintiff's employment and create an abusive work environment." Plaintiff specifically claims that she received five phone calls (four by Esford, one by Sapp) during which "sexual overtures" were made to her. A review of the evidence submitted by Plaintiff, an unauthenticated investigative report of Plaintiff's

allegations of harassment, does not reveal conduct that is actionable under Title VII. The five phone calls are described in that report as follows: [2]

**First phone call (February 2, 1995):**

At approximately 3:00am, a person identifying themselves as "Sterling" telephoned Graham in Tower # 1. He stated he was calling from "Hires" room at the BOQ and was "drinking." He asked her to go out with him and she refused. He stated she had said she would. She told him she had said she saw nothing wrong with friends going out for coffee. She told him she did not appreciate him calling when drunk and did not want to go out with him. He stated "Bobby" (Lieutenant Robert Waters) owed him some favors and could have her relieved so she could go to his BOQ room. He told her he could not stop thinking about her and needed to talk to her, stating he would not touch her. She told him not to have her relieved, not to call her when drinking and that she did not want to go out with him. They hung up. Forty-five minutes later he called again and addressed the same issues. After arguing, Graham hung up on him. Graham identified no witnesses.

**Second phone call (February 4, 1995):**

At 2:15am, Esford telephoned her at her post in the Control Room. He was again drunk and calling from Hires room. He again asked why she would not go out with him and she again told him she did not want to go out with him and not to call her when drinking. He told her he had paid for photographs taken at the party so he could look at her because she was pretty. The conversation became repetitive and Graham hung up on Esford. Present were Goodale and Lieutenant Robert Waters. During the telephone call, Graham handed the telephone to Goodale who listened to Esford the [sic.] handed the telephone back to Graham. Goodale commented that Esford needed help. After she had hung up, Waters stated that he was proud of the way she handled the situation.

Waters asked Graham if she wanted "it" to stop, he'd have "it" stopped. Graham stated she wanted the telephone calls from Esford to stop and told Waters of the previous telephone call. Waters explained that Esford was going through hard times and that he would talk to Esford.

Graham explained that her son worked at Florida State Prison and she did not want rumors spreading that could embarrass him. She told Waters she felt she had been patient and that if her son was embarrassed, someone else would be hurt.

**Third phone call (February 18, 1995):**

Graham related that at 4:00am, while assigned to the Control Room, she received another call from Esford who stated that he had been drinking and was in Hire's room. Esford argued about Graham not wanting to go out with him, that he looks at her pictures, thinks she's pretty and his parents approve. Esford stated his "boss" had said it was alright for him to date Graham, that he could do what ever he wanted to on his own time. Esford stated that when he called, he was not only duty and if they went out it would be on their own time and "they" could not do anything about it. Esford was demanding about Graham going out with him.

**Fourth phone call (March 12, 1995):**

At 2:10am, Graham was assigned to "B" Dormitory and received a call from Esford who said he was calling from Douglas' room at the BOQ. Esford told her he had heard from three people that she was holding his and her conversations against him. She told him that she planned no action at that time. Esford said someone must be out to get her. She asked him what he meant by that and Esford reminded her he was the Major and could do as he wanted. Esford went on to say how pretty Graham was and ask why she would not go out with him. She told him she did not appreciate his calling, did not want [sic] relieved from her post and did not want to go out with him. He cut her off, stating, "Don't ever mention that again and do not say my

**2.** Although the Court agrees with the Defendant that the report is not properly before the Court, given that it is unaccompanied by an authenticat-

ing affidavit, the Court will assume, arguendo, that the information therein would be admissible.

name." Esford asked who was in the dormitory with her and she said, "Ms. Rimes." She hung up on him.

**Fifth phone call (March 20, 1995):**

At 2:30am, she was assigned to "B" Dormitory and received a call from someone who identified himself as her "Huckleberry". He asked if she knew who it was. She asked if it was Esford. He laughed. She said, "Sterling?" He mumbled "Sterling." She asked again and he said, "I'm your Huckleberry." He wanted to know if her black sergeant was there. she [sic.] confirmed. He repeated he was her Huckleberry and stated he was calling from "his home in Raiford." He said he'd been drinking all day and was drunk. He said he would be her everything. She told him she was mad and had to go. He said, "No you don't." She said she was busy, he said, "No you're not." She said she had to go, he said, "Okay baby.", [sic.] and she hung up.

The Court has no doubt that unsolicited calls such as these could be considered harassing; however, the law does not provide a remedy for every alleged injury, and the Court cannot allow the net of actionable sexual harassment to be cast so wide as to encompass five phone calls during which—at the most—the Plaintiff was asked out on a date. As stated recently by the Supreme Court of the United States,

" 'Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.' *Harris [v. Forklift Systems, Inc.],* 510 U.S. [17], at 21, 114 S.Ct. [367], at 370 [126 L.Ed.2d 295 (1993)], *citing Meritor [Savings Bank, FSB v. Vinson],* 477 U.S. [57], at 67, 106 S.Ct. [2399], at 2405–2406[, 91 L.Ed.2d 49 (1986)]. We have always regarded that requirement as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace—such as male-on-male horseplay or intersexual flirtation—for discriminatory 'conditions of employment.' "

*Oncale v. Sundowner Offshore Services, Inc.,* — U.S. ——, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998). Accordingly, Defendant is entitled to judgment as a matter of law on Plaintiff's claims for sexual harassment.

■ Turning next to Plaintiff's claim for retaliation, the Defendant argues that Plaintiff has failed to establish that she suffered an adverse employment decision and that such decision was related to her filing a claim for sexual harassment. The Court agrees that Plaintiff has failed to establish that she suffered an adverse employment decision. To prevail on a claim of retaliation under Title VII, Plaintiff must establish that she was engaged in a statutorily protected activity, that the employer has taken an adverse employment action against her, and that a causal connection exists between the two. *See Fleming v. Boeing Co.,* 120 F.3d 242, 248 (11th Cir.1997). Plaintiff has not pointed to evidence in the record supportive of such a claim. Plaintiff alleges as follows: "Based on Plaintiff's complaint of sexual harassment, Defendant DOC transferred her out of her position at North Florida reception Center; knowingly causing hardship on her and her family." Complaint at ¶ 18. As recently stated by the United States District Court for the Middle District of Alabama:

"... [The job action] is not adverse merely because the employee dislikes it or disagrees with it." *Perryman v. West,* 949 F.Supp. 815, 819 (M.D.Ala.1996). The contours of what constitutes a "term or condition of employment" are not well developed in this circuit, but *Wu v. Thomas,* 996 F.2d 271 (11th Cir.1993), indicated that it must be something like a loss of salary, benefits, or position. *Id.* at 273. Not all employment actions are actionable under Title VII. *Id.; see also Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.1981) ("[T]here are many interlocutory or mediate decisions having no immediate effect upon employment conditions which were not intended to fall within the direct proscriptions ... of Title VII."). Other circuits follow this general approach. *See, e.g., Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 707 (5th Cir.1997) (" 'Title VII was designed to address ultimate employment decisions, not to address every decision made by employ-

ers that arguably might have some tangential effect upon those ultimate decisions.' 'Ultimate employment decisions' include acts 'such as hiring, granting leave, discharging, promoting, and compensating.' ") (*quoting Dollis v. Rubin*, 77 F.3d 777, 781–82 (5th Cir.1995)); *Jeffries v. State of Kansas*, 946 F.Supp. 1556, 1567 (D.Kan.1996) ("Although adverse job actions cover more than quantifiable losses of salary or benefits, not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.1996). To be actionable, the adverse employment action must be 'material:' '[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. *Rabinovitz v. Pena*, 89 F.3d 482, 488 (7th Cir. 1996) (*quoting Crady v. Liberty Nat'l Bank & Trust*, 993 F.2d 132, 136 (7th Cir.1993))."). *Malladi v. Brown*, 987 F.Supp. 893, 914 (M.D.Ala.1997).

The Court does not believe that Plaintiff's reassignment to Lawtey can be construed as an adverse employment decision. Plaintiff's unhappiness with the reassignment does not make the reassignment adverse. *Malladi v. Brown*, 987 F.Supp. 893, 914. Additionally, there is no evidence before the Court that Plaintiff lost pay or benefits as a result of the transfer. That the reassignment was not an adverse decision is further supported by the fact that Plaintiff wanted to leave the North Florida Reception Center. *See* Deposition Transcript Excerpt óf Susan G. ("Graham Tr.") (Exhibit A, *attached to* Doc. No. 79, filed January 16, 1998) at p. 83. Although she wanted to be transferred to another location, she acknowledged that such a transfer would have been in violation of the DOC's rules and regulations. Graham Tr. at p. 79. Further, the Court notes that while Plaintiff alleges that the transfer caused "hardship on her and her family," Plaintiff has not submitted evidence of any hardship resulting from this transfer. Accordingly, Defendant is also entitled to summary judgment on Plaintiff's claim for Retaliatory Discharge.

Finally, Defendant is entitled to judgment as a matter of law on Plaintiff's claim for constructive discharge. In the Eleventh Circuit, to recover on a claim for constructive discharge the Plaintiff must establish that her working conditions were so intolerable that a reasonable person in her condition would have been compelled to resign. *See Kilgore v. Thompson & Brock Management Inc.*, 93 F.3d 752, 754 (11th Cir.1996). Plaintiff alleges as follows: "In not appropriately remedying Plaintiff's Complaint (of sexual harassment), Defendant DOC constructively discharged her." Complaint at ¶ 19. Accordingly, Plaintiff essentially alleges that the harassment by Esford and Sapp created an environment so intolerable that a reasonable person would have resigned as a result. The Court has already found that Esford's and Sapp's phone calls do not amount to actionable sexual harassment; however, the calls could still be considered in a constructive discharge analysis.

The Court does not believe that a reasonable person would have been compelled to resign as a result of Defendant's alleged failure to take prompt, remedial action against Esford and Sapp for making these phone calls. Again, while the Court acknowledges that these calls may have been harassing, they *do not rise to the level of creating or constituting a* "hostile work environment." Further, Plaintiff expressed satisfaction with the disciplinary actions ultimately carried out against Esford and Sapp. *See* Graham Tr. at pp. 108–109.[3] Most importantly, however, is the fact that Plaintiff's bare allegations in the

---

3. The Court notes that DOC ultimately discharged Esford and suspended Sapp without pay after conducting an investigation into their behavior with respect to several women, including the Plaintiff. A review of the unauthenticated investigative report submitted by Plaintiff reveals that the allegations made by the other women are a good deal more egregious than those made by Plaintiff.

Complaint are insufficient to defeat Defendant's properly support motion for summary judgment. There is no evidence that Plaintiff believed she had been forced to resign because of the DOC's alleged failure to act against the phone calls. Further, the excerpts of Plaintiff's deposition submitted by *Defendant* demonstrate that Plaintiff believed she was forced to resign because of Defendant's refusal to allow Plaintiff to change shifts while stationed at Lawtey. *See* Graham Tr. p. 184. Plaintiff does not make this allegation in her Complaint, and did not seek leave to amend. However, even were the Court to consider this allegation, Plaintiff has not rebutted Defendant's evidence that there were no openings for Plaintiff's desired shift during the time that she requested the shift change. *See, e.g.,* Affidavit of Major Jack Cairel (Exhibit B, *attached to* Doc. No. 79) at ¶¶ 6, 10. Further, there is no evidence that a reasonable person would have considered the shift worked by Plaintiff—or the failure to obtain a shift change—to have constituted and/or created an intolerable work environment.

In light of the foregoing, it is **ORDERED AND ADJUDGED** that:

(1) Defendant's Motion for Summary Judgment (Doc. No. 77) is **GRANTED;**

(2) The Clerk shall enter judgment in favor of Defendant and against the Plaintiff; and

(3) The Clerk shall close the file.